**SO ORDERED.**

**SIGNED this 16 day of August, 2007.**



_____
Dale L. Somers
**Dale L. Somers**
**UNITED STATES BANKRUPTCY JUDGE**

_____

**Opinion Designated for Print and On-Line Publication**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

In re:

**JAHN ELDREDGE ROEDEMEIER,**

                        **DEBTOR.**

**CASE NO. 06-20292-11**
**CHAPTER 11**

**OPINION APPROVING THE DEBTOR'S DISCLOSURE STATEMENT,**

**AND CONFIRMING HIS PLAN**

      This matter was before the Court on April 5, 2007, for a combined hearing on approval of the Debtor's disclosure statement and confirmation of his plan of reorganization. The Debtor appeared by counsel Thomas Mullinix and Joanne Stutz. Creditor Bankers Healthcare Group did not object to the plan, but did object to (1) the disclosure statement, (2) the consolidation of the hearings on approval of the disclosure statement and confirmation of the plan, and (3) the Debtor's summary of balloting.

Bankers appeared by counsel Elizabeth A. Carson. Late in January 2007, the Court issued an order consolidating the hearings on approval of the disclosure statement and confirmation of the plan. On April 5, the Court heard evidence concerning the disclosure statement and the plan. On April 10, the Court issued an order resolving the balloting dispute and directing the parties to submit written closing arguments on approval of the disclosure statement and confirmation of the plan, which they have done. The Court is now ready to rule on those matters.

**FACTS**

The Debtor has been a practicing dentist since graduating from dental school in 1979. Until 1996, his practice included at least one partner-dentist, and from 1982 until 1996, the practice operated at two locations. When the Debtor's co-owner severed their relationship in 1996, the Debtor assumed all the debts of the Roedemeier-Quattrochi DDS, P.C. ("R-Q"), and continued to use its name until 2005.

R-Q had done business as College Boulevard Dental Care, first on College Boulevard and later on Antioch Road, both in Overland Park, Kansas. While that practice was doing well, the Debtor hired another dentist in June 2003 to work three days a week, and arranged for another to start working in July 2004. The Debtor also obtained a loan commitment from the Small Business Administration to move the practice to a location on Metcalf Avenue in Overland Park and to pay off the R-Q debts. When a malpractice suit was filed against him, however, the Debtor lost the SBA financing and the two other

2

dentists left his practice. He still moved his practice, and ultimately won the malpractice suit.

In April 2005, trying to recover from the damage to R-Q's practice caused by the lawsuit, the Debtor formed Deer Creek Family Dental Care, L.L.C., and began operating his practice through that entity. A company that had financed R-Q's equipment vigorously pursued the Debtor to collect on his guarantee of R-Q's debt, and he filed a Chapter 11 bankruptcy petition in March 2006. According to the Official Bankruptcy Form 22B the Debtor completed, his "current monthly income" for the six months before he filed his petition averaged $4,953 per month.

On January 8, 2007, the Debtor filed a disclosure statement, a Chapter 11 plan, and a motion to consolidate the hearing on approval of the disclosure statement and confirmation of the plan. Bankers Healthcare Group, Inc., one of R-Q's creditors whose debt the Debtor had guaranteed, filed two objections, one objecting to the disclosure statement and the other objecting to the consolidation motion.[1] Significantly, Bankers did not object to the Debtor's plan. The Court signed an order approving the consolidation motion, setting the consolidated hearing for April 5, 2007.

Later, the Debtor filed a "Summary of Balloting," reporting that only two votes had been received, one by the Class 4 creditor and the other by one of the Class 5

---

[1]The objection to the consolidation motion is described on the docket in such a way that it appears to be an objection to the disclosure statement and plan, rather than to the consolidation motion, although the phrase "consolidation of" does appear just before Bankers Healthcare is identified as the party filing the objection. *See* Docket No. 89.

3

creditors, the class of general unsecured creditors. Bankers objected to the summary, claiming it had never received a ballot and asking to have the summary withdrawn or stricken from the record. This issue was taken up at the April 5 hearing, along with the questions whether to approve the Debtor's disclosure statement and whether to confirm his plan. In an order issued a short time after the hearing, the Court resolved Bankers' objection to the Debtor's balloting summary by treating Bankers as having voted against the plan, leaving Class 4 as the only impaired class that had accepted the plan. The Court noted that its ruling meant the confirmation requirement established by 11 U.S.C.A. § 1129(a)(10) that at least one impaired class accept the plan had been satisfied. In the same order, the Court gave the Debtor and Bankers time to submit written closing arguments explaining their positions about approval of the Debtor's disclosure statement, and confirmation of his plan. The parties have now submitted their arguments. The Court will make additional findings as it discusses the parties' claims.

At the hearing on April 5, 2007, the Court allowed Bankers to start the presentation of evidence, even though the Debtor had the burden to prove his disclosure statement should be approved and his plan should be confirmed. During the hearing, Bankers never objected that any of the evidence the Debtor presented was going beyond the scope of Bankers' own presentation. In its closing argument, however, it argues the Debtor "failed to present any evidence whatsoever except on rebuttal" and that this failure alone justifies denying approval of the disclosure statement and denying confirmation of

4

the plan, citing no authority for this claim. Federal Rule of Evidence 611(a)[2] gives the Court broad discretion to control the presentation of evidence, and the Court is aware of no authority suggesting that evidence presented without objection at any stage of a trial is less worthy of consideration or entitled to less weight than any other evidence. In a criminal case, the Tenth Circuit ruled that evidence submitted during rebuttal was sufficient to establish an essential element of a crime and support a conviction, even though at the close of the government's case-in-chief, the trial court had deferred ruling on the defendant's motion for acquittal.[3] Clearly in this civil matter, the Debtor's evidence can be sufficient to support granting the relief he is seeking even if it should be considered to have been submitted during rebuttal rather than during his case-in-chief.

The Debtor's proposed plan of reorganization is not complicated. He wants to continue to run his dental practice through the Deer Creek entity. Deer Creek will pay its operating expenses, including payroll taxes and taxes imposed on personal property it has, and will assume obligations the Debtor incurred to National Bank of Kansas City for certain pieces of equipment, but treat the transactions as financing agreements rather than leases. Deer Creek will pay the Debtor a salary, which he will use to pay: (1) his living expenses, including first and second mortgages on his home, (2) the administrative expenses of his bankruptcy case (including his attorney fees, though Deer Creek may also

---

[2]*See* Fed. R. Evidence 101 & 1101 (Federal Rules of Evidence apply in proceedings before bankruptcy judges).

[3]*United States v. Smurthwaite*, 590 F.2d 889, 891 (10th Cir. 1979).

5

pay them), (3) priority tax claims of about $73,000, and (4) five annual payments of $6,000 to be distributed pro rata among his general unsecured creditors. According to the Debtor and his expert witness, Tom J. McCann, Jr., Deer Creek will be able to generate sufficient income to allow the plan to succeed so long as it can increase its business enough to occupy two dental hygienists full time, instead of having one work full time and another part time, as the company has been doing. The Debtor is optimistic that the business can accomplish that goal and perhaps even add another dentist. Mr. McCann testified that the financial projections for Deer Creek that were attached to the disclosure statement were conservative and, based on the dental practice's history, should be achievable.

**DISCUSSION**

The evidence presented at the April 5 hearing left the Court with the initial impression that the Debtor's disclosure statement adequately described his plan of reorganization, and that he could be successful under the plan so long as he can continue to produce the same level of income for Deer Creek with his own services, and increase the practice enough to occupy two dental hygienists full time. There is a good chance he would be able to expand the practice more than that, making performance of the plan even easier and more certain. But Bankers raises a number of questions requiring more detailed analysis. The Debtor's request to evaluate the plan under the cramdown provisions of § 1129(b) also requires more discussion.

*1. Should the Debtor's disclosure statement be approved, despite Bankers' objections?*

6

In its objection to the Debtor's disclosure statement, Bankers raised five issues: (1) the Debtor asserted an improper homestead exemption in the case; (2) the Debtor claimed to own equipment that belonged to R-Q; (3) the disclosure statement does not state what becomes of the equipment the Debtor appropriated (apparently referring to equipment that belonged to R-Q) or how that is dealt with; (4) the disclosure statement does not disclose how the Debtor plans to compensate R-Q's secured creditors or explain why those creditors should not be separately classified; and (5) the Debtor proposes to treat some of R-Q's creditors separately but not all of them, and does not indicate that this is what his plan would do. The first issue was resolved by an agreed order submitted by the Debtor and Bankers, and the second issue was resolved by the Court's order ruling the equipment still belonged to R-Q.

In Bankers' third issue, assuming it was referring only to the equipment that belonged to R-Q, Bankers has correctly pointed out that the disclosure statement does not explain what became of that equipment. The disclosure statement indicates that when he filed his Chapter 11 petition, the Debtor claimed to own the equipment, but does not indicate what happened to the equipment after the Court ruled R-Q still owned it. At the hearing, the Debtor explained that after the Court's ruling, Matsco, the R-Q creditor with a first lien on the equipment, foreclosed on it, a friend of the Debtor's bought it at the foreclosure sale, and Deer Creek then leased or bought the equipment from the friend. Under these circumstances, the Court believes the disclosure statement should have explained the Debtor lost on his claim to own the property and Deer Creek wound up

7

leasing it; in fact, the disclosure statement might have been more clear if it had simply left out the Debtor's ultimately unsuccessful assertion that he owned the equipment. Nevertheless, the Court does not believe this shortcoming is sufficient to make the disclosure statement inadequate.

Bankers' fourth and fifth issues are not relevant to the Debtor's reorganization efforts. R-Q was a separate entity, and the Debtor has proposed dealing with its creditors only to the extent he is personally liable to them for R-Q's debts. For example, he is personally liable to the Internal Revenue Service for payroll withholding taxes ("941 taxes") that R-Q failed to pay, and he is proposing to pay that liability through his plan. Matsco's foreclosure on R-Q's equipment would have extinguished Bankers' second lien on that property, and Bankers has not identified any other property that either the Debtor or Deer Creek has that ever secured R-Q's debt to Bankers or secured the Debtor's personal guaranty of that debt. Since Bankers' claim is not secured by any property of the Debtor or Deer Creek, the fact the claim might have been secured by R-Q's property does not mean the Debtor is obliged to treat it as a secured claim in his plan. The Debtor is only required to deal with his own liabilities in his plan, not with any of R-Q's debts that he is not liable for.

While some courts have provided long lists of various types of information that they feel should be included in a disclosure statement,[4] a leading bankruptcy treatise notes

---

[4] *E.g., In re Cardinal Congregate I*, 121 B.R. 760, 764-76 (Bankr. S.D. Ohio 1990).

that the lists have appeared in cases involving medium to large reorganizations, often where securities would be issued in connection with the plan.[5]  The treatise suggests that for a smaller business like the Debtor's, the minimum information a disclosure statement should contain includes:

> — a description of the business;
> — its history;
> — financial information;
> — description of the plan;
> — facts respecting its execution;
> — a liquidation analysis;
> — identification of management and its compensation;
> — transactions with insiders; and
> — tax consequences of the plan.[6]

The Court believes the Debtor's disclosure statement supplies adequate information about all these matters for unsecured creditors like Bankers to make an informed judgment about the plan, all that is required under the Bankruptcy Code.[7]

In its closing argument brief, Bankers complains for the first time that the disclosure statement did not include any valuation of Deer Creek or information about its assets and liabilities.  It is true the liquidation analysis attached to the disclosure statement[8] did not include any liquidation value for Deer Creek, but the Debtor testified

---

[5]7 *Collier on Bankruptcy*, ¶ 1125.02[2] at p. 1125-12 (Resnick & Sommer, eds.-in-chief, 15th ed. rev. 2007).

[6]7 *Collier on Bankruptcy*, ¶ 1125.02[2] at pp. 1125-12 to 1125-13 (citing *In re Malek*, 35 B.R. 443 (Bankr. E.D. Mich. 1983)).

[7]*See* 11 U.S.C.A. § 1125(a)(1) & (b).

[8]Exhibit E to the Disclosure Statement.

9

that he thought the company had no value.  As one of the Debtor's attorneys pointed out at the hearing, a professional practice has no liquidation value in the absence of the professional's covenant not to compete, a promise the Debtor cannot be required to make if Deer Creek is forcibly liquidated.  In addition, under the Debtor's liquidation analysis, a sale of Deer Creek would have to net more than $105,000 before any money would become available to be distributed to general unsecured creditors like Bankers.

The only effort Bankers made to present evidence of Deer Creek's value was to ask the Debtor about a statement of R-Q's financial position that he gave to Bankers in 2003, presumably in connection with a new loan, renewal of an existing loan, or Bankers' review of R-Q's debt to it.  The Debtor pointed out that R-Q was a different company at a different location, and claimed that its business deteriorated significantly between 2003 and 2005, when it ceased operating.  The liquidation analysis attached to the Debtor's disclosure statement is just that, an analysis of the Chapter 7 liquidation value of the Debtor's assets, while the financial information the Debtor gave Bankers in 2003 would presumably have been valuing R-Q as a going concern.  The going concern value of a one-dentist dental practice is obviously tied almost completely to that dentist, and any sale of the practice without that dentist's participation, cooperation, and promise not to compete with the ongoing practice — a Chapter 7 liquidation sale, for example — would almost certainly bring a very low price, assuming it could produce any buyer at all. Bankers presented no evidence to refute this assessment of Deer Creek's value.

10

Considering all the circumstances of this case, the Court concludes the Debtor's disclosure statement contains the "adequate information" required by § 1125(a) and (b) of the Bankruptcy Code, and overrules Bankers' objection to it. The disclosure statement is hereby approved.

*2. Should the Debtor's plan be confirmed?*

Even though the only objection to the Debtor's plan has been resolved, the Court is obliged to review the plan to ensure it complies with the confirmation requirements of § 1129.[9] Most of those requirements are found in subsection (a) of that statute. The Court has reviewed the various provisions of subsection (a) and evaluated the Debtor's plan under them. Paragraphs (1), (2), (3), (4), and (5) of subsection (a) have clearly been met. Paragraph (6) does not apply in this case. Paragraph (7) has been met because the Debtor is proposing to pay his secured creditors in full, except for one whose collateral was sold subject to its lien to a buyer who assumed full responsibility to pay the creditor's claim, and the Debtor is proposing to pay his unsecured creditors $30,000 over five years, which is more than they would receive in a Chapter 7 liquidation. Paragraph (8) has not been met because to resolve Bankers' assertion it never received a ballot for voting on the plan, the Court accepted the Debtor's suggestion to treat Bankers as having voted against the plan, which means the class of unsecured creditors must be deemed to have rejected the plan. The administrative claims and allowed priority tax claims are to be paid as

---

[9]7 *Collier on Bankruptcy*, ¶ 1129.02[5].

permitted by paragraph (9). Paragraph (10) has been met because the Class 4 creditor, National Bank of Kansas City, is impaired and has accepted the plan. The evidence presented has established to the Court's satisfaction that confirmation of the plan is not likely to be followed by the need for liquidation or further reorganization, so paragraph (11) has been met. The plan provides for the payment of quarterly fees to the United States Trustee as required by paragraph (12), so that requirement has been met. Paragraphs (13) and (14) do not apply in this case. According to a leading bankruptcy treatise, paragraph (16), added by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, applies only to nonprofit entities,[10] and the Court concludes it does not apply in this case.

Because resolution of Bankers' argument that paragraph (15) has not been met requires a more detailed analysis, it will be discussed below. Although one class of impaired creditors has voted against the Debtor's plan, he has asked the Court to consider confirming the plan anyway, as allowed by § 1129(b), an option commonly referred to as "cramdown." That request raises questions about the absolute priority rule, which will also need more extensive discussion.

a. *Does the Debtor's plan satisfy the projected disposable income requirement of § 1129(a)(15)(B)?*

---

[10]7 *Collier on Bankruptcy*, ¶ 1129.03[16].

The main argument Bankers makes in its brief opposing approval of the Debtor's disclosure statement and confirmation of his plan is based on § 1129(a)(15) of the Bankruptcy Code, a provision added to Chapter 11 by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. For the Chapter 11 plan of an individual debtor to be confirmed, this paragraph establishes the following new requirements:

> (15) In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan —
>
> (A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
>
> (B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

Before going any further, the Court must point out that this provision applies only when the holder of an allowed unsecured claim objects to confirmation, which Bankers did not do in this case. Consequently, while the Debtor's plan would not pay Bankers in full under subparagraph (A), the plan is also not required to satisfy the requirements of subparagraph (B), even though Bankers now argues the Debtor failed to show that his plan calls for the distribution of property with a value equal to five years' worth of his projected disposable income.

The Court is convinced the Debtor's plan would satisfy § 1129(a)(15)(B) even if Bankers had objected to the plan. The provision refers to § 1325(b)(2) for the definition of "projected disposable income." Section 1325(b)(2) says:

13

> For purposes of this subsection, "disposable income" means current monthly income received by the debtor . . . less amounts reasonably necessary to be expended —
>> (A)(i) for the maintenance or support of the debtor or a dependent of the debtor . . . ; and
>> (ii) for charitable contributions . . . in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made.

After the BAPCPA was enacted, three new Official Bankruptcy Forms (22A, 22B and 22C) concerning "current monthly income" were created for individuals to complete and file in Chapter 7, 11, and 13 cases. Bankers suggests the Debtor failed to complete a form 22 to support his effort to show he will be distributing the value of his projected disposable income under his plan. However, a completed Form 22B, the form required for an individual Chapter 11 debtor, appears as the last two pages of the attachments to the Debtor's voluntary petition, and shows his "current monthly income" was $4,953 per month.

Bankers contends the Debtor's "current monthly income" as of the date he filed his petition was greater than the median income for a family of one in Kansas, so under § 1325(b)(3), the expense side of his "projected disposable income" is controlled by the Chapter 7 means test. Since § 1325(b)(3) specifies that the expense portion of the calculation of projected disposable income under § 1325(b)(2) for an above-median-income debtor must be determined according to the Chapter 7 means test, this is a plausible way to interpret § 1129(a)(15)(B)'s incorporation of § 1325(b)(2). The Court cannot agree, however, that it is the correct interpretation of the new provision.

14

The Advisory Committee on Bankruptcy Rules that drafted the Interim Bankruptcy Rules and Forms to implement the BAPCPA disagreed with Bankers' reading of § 1129(a)(15)(B), and omitted the Chapter 7 means-test expenses from Official Form 22B, the one that individual Chapter 11 debtors are supposed to complete. The Committee explained:

> The Chapter 11 form is the simplest of the three [22A, 22B, and 22C], since the means-test deductions of § 707(b)(2) are not employed in determining the extent of an individual Chapter 11 debtor's disposable income. Section 1129(a)(15) requires payments of disposable income "as defined in section 1325(b)(2)," and that paragraph allows calculation of disposable income under judicially-determined standards, rather than pursuant to the means test deductions, specified for higher income Chapter 13 debtors by § 1325(b)(3). However, § 1325(b)(2) does require that CMI be used as the starting point in the judicial determination of disposable income, and so the Chapter 11 form requires this calculation (in Part I of the form), as described above, together with a verification (in Part II).[11]

A leading bankruptcy treatise describes the reading of § 1129(a)(15)(B) that Bankers proposes as "flawed."[12] Based on these authorities, the Court concludes that in calculating an individual Chapter 11 debtor's projected disposable income, § 1129(a)(15)(B) must be read to allow a judicial determination of the expenses that are reasonably necessary for the support of the debtor and his or her dependents. Bankers has not questioned the reasonableness of any of the Debtor's claimed expenses, and the Court declines to raise that question itself.

---

[11]Section D.2. of 2005 Committee Note to Official Bankruptcy Forms 22A, 22B, and 22C, *reprinted in* Norton Bankruptcy Law and Practice 2d, Bankruptcy Rules, at 1146 (Thomson/West 2006-2007 ed.).

[12]7 *Collier on Bankruptcy*, ¶1129.03[15][a] at p. 1129-74.9.

15

The Debtor's "current monthly income," as reported on his Form 22B, is substantially less than the monthly personal expenses he projects having to pay to support himself during his plan. Consequently, the projected disposable income the Debtor would be expected to receive during the five-year period beginning on the date his first payment would be due following confirmation of his plan, calculated as required by § 1129(a)(15)(B), is $0. Since the Debtor's plan proposes to distribute property worth more than that, the plan satisfies this new confirmation requirement.

*b. Does the Debtor's plan satisfy the requirements for cramdown under*

*§ 1129(b)(2)(B)?*

Although his plan has been rejected by the class of general unsecured creditors, the Debtor has asked the Court to consider confirming the plan through cramdown under § 1129(b). As relevant here, paragraph (1) of that subsection provides:

> [I]f all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

Under this paragraph, the Court must determine whether the plan "does not discriminate unfairly" against the general unsecured creditors, and "is fair and equitable" with respect to them. The prohibition against unfair discrimination is concerned only with differing treatment among classes of the same priority.[13] The only unsecured creditors the Debtor

---

[13]*See* 7 *Collier on Bankruptcy*, ¶ 1129.04[3].

has are priority tax creditors and general unsecured creditors. The tax creditors are, of course, entitled to the priority Congress has given them in the Bankruptcy Code, and the Debtor's plan treats their claims accordingly. The plan places all the general unsecured creditors in a single class, so it contains no discrimination, fair or unfair. This leaves the question whether the plan is fair and equitable.

Before the BAPCPA was enacted in 2005, the fair and equitable requirement of cramdown had two key components that unquestionably applied to all Chapter 11 debtors: (1) the absolute priority rule, and (2) the rule against paying any creditor more than it is owed.[14] The Court sees nothing indicating the Debtor's plan would pay any creditor more than it is owed, but the fact the Debtor is proposing to remain the owner of Deer Creek raises the question whether the absolute priority rule might bar confirmation.

As relevant in this case, § 1129(b)(2)(B) indicates the "fair and equitable" requirement includes at least the following part of the judicially-developed absolute priority rule:

> With respect to a class of unsecured claims —
>     (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>     (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain

---

[14] *7 Collier on Bankruptcy*, ¶ 1129.04[4][a]. For an extensive discussion of all aspects of cramdown, *see* 7 *Collier on Bankruptcy*, ¶ 1129.04[4][a], [b], & [c], and ¶ 1129.05[1] through [4].

> property included in the estate under section 1115, subject to the
> requirements of subsection (a)(14) of this section.

The Debtor's plan proposes to pay $30,000 on general unsecured claims totaling about $875,000, a dividend of less than 3%, so subparagraph (i) does not apply here. Before the BAPCPA, subparagraph (ii) did not include the "except" clause that applies only to individual debtors, so it largely precluded individual debtors from retaining ownership of their businesses through a Chapter 11 plan since few of them could satisfy subparagraph (i) by paying their unsecured creditors in full. The BAPCPA added the clause at the end of subparagraph (ii), obviously creating some sort of exception for individual Chapter 11 debtors to the part of the absolute priority rule stated in that subparagraph. The question in this case becomes what that new exception means.

In addition to the exception that was appended to § 1129(b)(2)(B)(ii), the BAPCPA added to the Bankruptcy Code § 1115, one of the provisions referred to in the exception. Subsection (a) of § 1115 reads:

> In a case in which the debtor is an individual, property of the estate includes, in addition to the property specified in section 541 —
> (1) all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first; and
> (2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first.

This new provision both refers to the property already brought into the bankruptcy estate by § 541 and brings more property into the estate. Unfortunately, the exception and

Case 06-20292   Doc# 120   Filed 08/16/07   Page 18 of 23

§ 1115(a) are worded in such a way that the exception could be construed narrowly to cover only the additional, postpetition property brought into the Chapter 11 bankruptcy estate by § 1115(a), or broadly to cover not only that property but also all the property brought into the estate by § 541, most of which is property the debtor had before filing for bankruptcy. The first construction would greatly limit the impact of the new exception under § 1129(b)(2)(B)(ii), but the second would exempt an individual Chapter 11 debtor from the main facet of the absolute priority rule, allowing him or her to retain both pre- and postpetition property under a plan even though a class of unsecured creditors would not be paid in full. The Court must determine which interpretation matches Congress's intent in making these changes.

Before the BAPCPA, some debtors tried to avoid the absolute priority rule by arguing that under a plan like the Debtor's, he would retain his ownership of Deer Creek "on account of" his contribution of new value to the bankruptcy estate (the $30,000 from his postpetition earnings and other business income to be distributed to his general unsecured creditors), not "on account of" his prepetition ownership. This possibility is typically referred to as the new value exception or new value corollary to the absolute priority rule. In *Norwest Bank Worthington v. Ahlers*, however, the Supreme Court ruled that any new value proposed to be contributed in order to avoid the absolute priority rule must be in money or money's worth, and that a contribution of labor or services in the

Case 06-20292   Doc# 120   Filed 08/16/07   Page 19 of 23

future cannot fulfill that requirement.[15]  As of the time the Debtor's plan might be confirmed, his proposed contribution of $30,000 from his postpetition earnings and other business income would be, to the extent it came from his earnings (sure to be the bulk of the income of the dental practice), nothing more than his promise to contribute the product of his future labor or services, a promise essentially the same as the contribution rejected in *Ahlers*.  Consequently, the Debtor's proposed contribution would not satisfy the money-or-money's-worth requirement of any new value corollary that might exist.

As a matter of fact, for most individual debtors, their future labor or services are the only significant source of new value they will have available to them, and *Ahlers* means they cannot propose a confirmable Chapter 11 plan.[16]  If the new exception in § 1129(b)(2)(B)(ii) is read narrowly, although it would mean the Debtor could keep his postpetition earnings and other property he acquired postpetition without violating the absolute priority rule, the exception would not help him avoid the *Ahlers* ruling because the new value he would be contributing to the plan would still be at least mostly his postpetition earnings,[17] and he would be retaining his prepetition ownership of Deer

---

[15]485 U.S. 197, 202-06 (1988).

[16]See 4 William L. Norton, Jr., & William L. Norton, III, *Norton Bankruptcy Law & Practice 2d*, § 84A:5 (2007) (discussing difficulty of separating sole proprietor's income generated by personal services from other business income), and § 84A:8 (discussing difficulty individual debtors had in providing new value that could let them keep their businesses without paying creditors in full).

[17]The Debtor's offer of new value in the form of whatever other business income he would be contributing to the plan could not currently be accepted as sufficient new value to justify his retention of Deer Creek because its adequacy has not been tested by any form of market valuation, as required by the Supreme Court's decision in *Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 437 (1999).

Creek. These considerations indicate the narrow reading of the new exception in § 1129(b)(2)(B)(ii) would have little impact on this Debtor's (and probably most other individual debtors') ability to reorganize in Chapter 11.

The broader view of the exception, on the other hand, helps to explain why a number of changes, including the exception, were made to Chapter 11, namely, so that it could function for individual debtors much like Chapter 13 does. Many of the BAPCPA's changes to Chapter 11 apply only to individual debtors and are clearly drawn from the Chapter 13 model:

1.      § 1115 brings property the debtor acquires postpetition into the estate;

2.      § 1123(a)(8) calls for the debtor's plan to provide for payment to creditors from the debtor's postpetition earnings from services or other future income;

3.      the exception in § 1129(b)(2)(B)(ii) allows the debtor to keep property included in the estate under § 1115, without paying in full a class of unsecured creditors that rejected his or her plan;

4.      § 1129(a)(15) authorizes the debtor to overcome an objection to the plan made by a single unsecured creditor by proposing to distribute under the plan property worth at least as much as the debtor's projected disposable income for a five-year period;

21

5.    § 1141(d)(5) ordinarily delays the entry of the debtor's discharge

until completion of all payments under the plan; and

6.    § 1127(e) permits modification of a confirmed plan even after

substantial consummation for certain purposes.[18]

Significantly, Chapter 13 does not impose the absolute priority rule on debtors.[19]  Taken

together, these changes indicate Congress intended to extend the exemption from the

absolute priority rule to individual Chapter 11 debtors as well.  If a class of unsecured

creditors who are not to be paid in full under an individual Chapter 11 debtor's plan can

bar the debtor from keeping any prepetition property (which will nearly always include

the debtor's interest in whatever business the debtor engages in) by rejecting the plan and

invoking the absolute priority rule — that is, if the new exception in § 1129(b)(2)(B)(ii) is

read narrowly — then it is difficult to see what purpose these other, related amendments

can serve.  At least one court has adopted the broader construction of the new exception

added to § 1129(b)(2)(B)(ii), indicating it could find no other court opinions considering

the question, but did find three commentators who took that view.[20]  This Court similarly

---

[18]See 5 Keith M. Lundin, *Chapter 13 Bankruptcy, 3d Ed.*, § 368.1 at pp. 368-1 to 368-5 (2000 & Supp. 2006) (correlating all these new Chapter 11 provisions with similar Chapter 13 provisions).

[19]Ralph A. Peeples, *Staying in:  Chapter 11, Close Corporations and the Absolute Priority Rule*, 63 Amer. Bankr. L.J. 65, 103-04 (Winter 1989) (noting both Chapter 12 and Chapter 13 lack the absolute priority rule, and suggesting best-efforts, disposable-income standard would be better than absolute priority rule in Chapter 11 for debtors who are close corporations, partnerships, and sole proprietors).

[20]*In re Tegeder*, ___ B.R. ___, 2007 WL 1549067 (Bankr. D. Neb. 2007).

22

concludes that Congress intended for the new exception to the absolute priority rule for individual Chapter 11 debtors to be read broadly.

Under the Debtor's plan, he would remain the owner of his limited liability company, Deer Creek Family Dental. Except for his exempt property, the Debtor's interest in his property is junior to his general unsecured creditors' interest in it. Deer Creek is an entity separate from the Debtor and it is property that he owned before filing for bankruptcy. If the absolute priority rule applied to the Debtor, his retention of Deer Creek would preclude confirmation of his plan. The Court is convinced, however, that it should adopt the broader construction of the new exception in § 1129(b)(2)(B)(ii), making the Debtor's plan exempt from the absolute priority rule. This conclusion means the Debtor's plan satisfies all the applicable requirements of § 1129, and it will be confirmed.

**CONCLUSION**

The Court concludes the Debtor's disclosure statement contains adequate information about his proposed plan of reorganization, so it is approved. The plan satisfies all the requirements of § 1129(a) except subparagraph (8), the requirement that the plan be accepted by all impaired classes. This makes cramdown under § 1129(b) available and, at the Debtor's request, the Court has considered that possibility. The Court concludes the Debtor's plan satisfies the applicable requirements for cramdown under § 1129(b), and the plan will therefore be confirmed.

# # #